IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

FILED

UNITED STATES BANKRUPTCY COURT
DISTRICT OF WYOMING

3:15 pm, 10/3/13

Tim J. Ellis
Clerk of Court

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| JASON WEST, | ) | Case No.  12-20403 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| UNIFIED PEOPLES FEDERAL | ) | |
| CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No.  12-2040 |
| | ) | |
| JASON WEST, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION ON COMPLAINT TO DETERMINE
## DISCHARGEABILITY OF DEBT

On September 11, 2013, the above-captioned matter came before the court for an

evidentiary hearing.  Unified People's Federal Credit Union ("Credit Union") requests

that the court determine the dischargeability of its debt, alleging: (1) the debt was

obtained under false pretenses, false representations or actual fraud; (2) fraud or

defalcation while acting in a fiduciary capacity; and, (3) willful and malicious injury by

the debtor to another entity or to the property of another entity.  Additionally, the Credit

Union requests attorney'S fees.  Debtor denies all allegations.  The parties were

represented as stated on the record. At the conclusion of the hearing, the court took the

matter under advisement.  Having reviewed the record, testimony and other evidence, the

court is prepared to rule.

**Jurisdiction**

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding within the definition of 28 U.S.C. § 157(b)(2)(I)

Plaintiff requests that its claim be excepted from discharge under 11 U.S.C. §§

523(a)(2)(A), (a)(4) and (a)(6).[1]

**Findings of facts**

The following relevant facts were established by admissions in the pleadings,

stipulation between the parties, or, are the court's findings.

Debtor, doing business as Capitol Auto Sales[2], and the Credit Union previously

entered into at least six consignment agreements prior to the transaction at issue before

the court.  Debtor agreed to sell the Credit Union's repossessed vehicles and was paid

$500.00 upon the sale of each vehicle as compensation for his services.  The Credit Union

separately paid any expenses related to the consigned property for cleaning or repair.

The consignment agreement form used by the parties has substantially the same

terms, except the date, specific description of the item to be sold, the "NADA retail"

price, and varying contact information for the Credit Union.

On July 19, 2011, the Credit Union and Debtor entered into a Consignment

Agreement ("Agreement").  Debtor agreed to sell a 2005 GMC Sierra pickup truck

---

[1] Unless otherwise noted, all statutory references are to Title 11 of the United States Code.

[2] Capitol Auto Sales was operated as a sole proprietorship by the Debtor.

("Truck") which the Credit Union repossessed.[3]  The Agreement was dated July 19, 2011

and executed by Debtor, and Renee Hunt for the Credit Union.[4]  The Agreement lists the

vehicle identification number, and "NADA Retail" in the amount of "$26,500.00."  The

terms of the Agreement, provide:

> "•    Consignor authorizes consignee to sell said vehicle for such price as
>       both deem advisable.
>
> •     Consignor shall receive from consignee the agreed sum in the form
>       of certified funds of said vehicle at time of sale.
>
> •     Consignor agrees to furnish free and clear title to consignee within
>       10 days of sale.
>
> •     Consignor authorizes the consignee to sell said automobile and to
>       transfer title to the purchaser.
>
> •     Consignor agrees to carry his/her insurance on said vehicle on
>       consignment with consignee.
>
> •     Consignee agrees to display said vehicle on the lot for a period
>       agreed upon by the Consignor and Consignee."

Debtor sold the Truck for the amount of $24,900.00.  The new purchaser obtained

financing through the Utah Heritage Credit Union ("Utah Heritage").  Utah Heritage sent

Debtor a check in the amount of $24,900.00, which he deposited into his business account

---

[3] Tamra Sayers and John Sayers ("Sayers") borrowed funds from the Credit Union.  After failing to repay the loan, the Sayers voluntarily surrendered the collateral, the Truck, that is at issue in this proceeding.  The Sayers are not bankruptcy debtors, nor otherwise involved in this case.

[4] The signatures for the parties are mixed up.  Jason West signed on the Owner/Consigner line and B. Renee Hunt signed on the Broker/Consigner line.  It was understood between the parties that Jason West was the Consignee and the Credit Union was the Consignor and the Agreement was a valid contract.

at Cheyenne State Bank ("Bank") on July 28, 2011.

On Friday, July 29, 2011, Debtor personally appeared at the Credit Union to deliver a check in the amount of $22,000.00, which was represented as the total amount of the sale proceeds.  He received the documents transferring the Truck's title to Capitol Auto Sales to further facilitate transferring the Truck's title to the new purchaser.  At that time, the Credit Union paid Debtor the amount of $500.00 for his services in selling the repossessed vehicle.

On Sunday, July 31, 2011, Debtor contacted the Credit Union with the instructions to remove a fifth wheel trailer that Debtor also had on his lot to sell for the Credit Union. Cathy LeMesurier ("LeMesurier"), Collection Officer at the Credit Union went to Debtor's sale lot.  She observed that the Credit Union's collateral was being used by an individual on the lot, as a storage area for their personal belongings as they maintained a temporary food selling business near the trailer.  LeMesurier contacted the Credit Union's president, Camille Shillenn.  Ms. Shillenn went to the sale lot.  While the two Credit Union employees were attempting to find someone to haul the fifth wheel trailer away off the Debtor's sales lot, Debtor and another person arrived.  The Debtor did not speak to LeMesurier and Shillenn, but the companion began screaming, "was very angry" and confrontational.  LeMesurier testified that the only item for sale on the lot was the Credit Union's trailer.  LeMesurier testified that the incident was tense, stressful and "not a good day."

Early the following morning, Monday, August 1, 2011, based upon the chaotic

contact with Debtor on Sunday, LeMesurier contacted the Bank to verify that Debtor's

business account had sufficient funds to honor the check in the amount of $22,000.00

provided to the Credit Union by the Debtor on the previous Friday. Ms. LeMesurier was

told that there were sufficient funds in Debtor's business account. A Credit Union

employee then took the check to the Bank. The Bank refused to honor the check, stating

that there were insufficient funds in the account. Between the time of receiving the call

from the Credit Union and its employee arriving with the check, the Bank set-off the

amount of $29,651.67 from Debtor's business account for a commercial loan that Debtor

had with the Bank. David Cook, a former Bank officer, testified that after receiving the

call from LeMesurier, he and the Bank's president went to Debtor's lot to research the

status of the business. Finding the lot empty, the Bank's Board of Directors deemed the

Debtor to be in default, and swept the Debtor's business account to satisfy Debtor's

business loan by the set-off.

**Discussion**

The Credit Union asserts that its claim should not be discharged as it was obtained

(1) under false pretenses, false representations or actual fraud; (2) fraud or defalcation

while acting in a fiduciary capacity; and, (3) willful and malicious injury by the debtor to

another entity or to the property of another entity. The burden is on the creditor to show a

debt is non-dischargeable. The standard of proof for the dischargeability exception in

§523(a) is preponderance of the evidence.[5] Exceptions to discharge are to be narrowly

---

[5] *Grogan v. Gardner*, 498 U.S. 279 (1991).

construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved

in the debtor's favor.[6]

Determining dischargeability based on false pretenses, false representations or actual
fraud under § 523(a)(2)(A)

The Bankruptcy Code states, as applicable,

"A discharge under section 727...does not discharge an individual
debtor from any debt...for money, property, service...to the extent obtain by
false pretenses, a false representation, or actual fraud."

(i)      False pretenses

To have its claim excepted from discharge under this section, the creditor must

prove: (1) the debtor made a false representation with the intent to deceive the creditor;

(2) the creditor relied on the representation; (3) the creditor's reliance was justifiable;

and, (4) debtor's representation caused the creditor to sustain a loss.[7]

Debtor sold the Truck for the amount of $24,900.00.  He presented a business

check to the Credit Union in the amount of $22,000.00, which he represented were the

sale proceeds from the sale.  The Debtor, without approval or agreement with the Credit

Union, retained the amount of $2,900.00 from the sale's proceeds, contrary to the

historical agreement between the parties that Debtor would be paid $500.00 upon a

successful sale.  Additionally, the Credit Union paid the Debtor the agreed amount of

$500.00 for his services.  The court finds that Debtor made a false representation with the

---

[6] *In re Kaspar*, 125 F.3d 1358 (10th Cir. 1997).

[7] *Fowler Brothers v. Young*, 91 F.3d 1367 (10th Cir. 1996).

intent to deceive the Credit Union that the Truck actually sold for the amount of

$24,900.00. Debtor intended that the Credit Union was be harmed by not receiving the

full amount of the sale. The Credit Union relied upon that representation and, in fact,

may not have known otherwise had Debtor's check cleared the Bank. The Bank was

justified in relying upon the Debtor, based upon the parties' historical relationship and the

Agreement that the parties executed.

To determine the Credit Union's loss, the court reviewed the events. Debtor

provided a check to the Credit Union in the amount of $22,000.00. At that time the

Credit Union was willfully and maliciously harmed in the amount of $2,900.00 and will

be accepted from discharge. However, the Credit Union does not provide evidence that

the Debtor intended it harm, when the $22,000.00 was not honored by the Bank.

(ii)    False representation

The Tenth Circuit Court of Appeals determined that to satisfy the criteria for non-

dischargeability, the false representation must have been made with the intent to deceive.

Intent to deceive may be inferred from the totality of the circumstances. In determining

whether a creditor's reliance was justifiable, a court should examine the qualities and

characteristics of the particular [debtor], and the circumstance of the particular case.[8]

Under the analysis above, the court determined that the Debtor intended to deceive

the Credit Union regarding the total amount of proceeds received from the sale of the

Truck. The court finds that the analysis and conclusion is the same as above, whereas the

---

[8] *Johnson v. Riebesell,* 586 F.3d 782 (10th Cir. 2009).

amount of $2,900.00 is excepted from discharge.

(iii)    Actual fraud

The state law of fraud controls with respect to whether fraud has occurred, while

bankruptcy law controls with respect to the determination of non-dischargeability.[9]  In

proving fraud, the debtor must have acted with the subjective intent to deceive the

creditor.[10]  Under Wyoming law, the elements of a claim for relief for fraud are: (1) a

false representation made by the defendant; (2) which is relied upon by the plaintiff to his

damage, (3) the asserted false representation must be made to induce action, and (4) the

plaintiff must reasonably believe the representation to be true[.][11]

The court determined that the Debtor made a false representation to the Credit

Union regarding the full amount of sale proceeds; and that the Credit Union relied upon

Debtor's representation and reasonably believed the proceeds from the sale of the Truck

were $22,000.00.  Debtor provided the check to the Credit Union, in the amount that

falsely represented the sales proceeds with the intent that the check would be credited as

the amount that Debtor owed to the Credit Union.

However, the court finds that the Credit Union did not provided evidence

regarding the third element.  The Credit Union did not provide evidence showing how the

Debtor's false representation of the sales amount induced or persuaded the Bank to set-off

---

[9] *In re Lang*, 293 B.R. 501 (10th Cir. BAP 2003).

[10] *In re Johnson*, 477 B.R. 156 (10th Cir. BAP 2012).

[11] *Duffy v. Brown*, 708 P.2d 433, 437 (Wyo. 1985).

Debtor's business account balance. The Credit Union did not carried its burden regarding the allegation of actual fraud.

<u>Determining dischargeability based upon fraud or defalcation while acting in a fiduciary capacity under § 523(a)(4)</u>

The Bankruptcy Code provides for an exception to discharge of a debt for fraud or defalcation while acting in a fiduciary capacity. A creditor must show: (1) the existence of a fiduciary relationship between the debtor and the objecting party; and, (2) a defalcation committed by the debtor in the course of that fiduciary relationship.[12] The existence of a fiduciary relationship under § 523, is determined under federal law.[13] In the Tenth Circuit, a fiduciary relationship exists only where a debtor has been entrusted with money pursuant to "an express or technical trust, not from a trust implied by law."[14] The general definition of fiduciary--a relationship involving confidence, trust and good faith--is too broad in the dischargeability context."[15] Within the Tenth Circuit, express trusts are those trust relationships which are intentionally entered into by the parties. An express trust may involve a formal declaration of trust or a situation where the intention of the parties to form a trust relationship may be inferred by the surrounding facts and circumstances. A technical trust is distinguished from an express trust in that the intention

---

[12] *Fowler Brothers* at 1371.

[13] *In re Parker*, 264 B.R. 685 (10th Cir. BAP 2001)

[14] *In re Sawaged*, Adv. Case No. 10-058, 2011 Bankr. LEXIS 792 (10th Cir. BAP, Mar. 15, 2011) at *3, citing *Fowler Bros.*, 91 F.3d at 1371 and *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir. 1976).

[15] *Sawaged*, supra.

of the parties is not relevant. In a technical trust, the trust obligations are imposed on the parties. Thus, a technical trust may be determined to exist by virtue of a statutorily imposed duty. However, for a state statute to create an express or technical trust for non-dischargeability purposes, the statute must define the trust res, establish trustee duties, and impose the trust prior to any wrongdoing creating the obligation.[16]

In this case, the Credit Union did not carry its burden and present testimony or evidence that the consignment relationship between itself and the Debtor rises to the level of an express or technical trust as required under §523(a)(4). As the court finds that no fiduciary relationship existed, it is unnecessary to determine whether fraud or defalcation occurred. Under this section, the court finds for the Debtor and against the Credit Union.

Determining dischargeability based on willful and malicious injury by the debtor to another entity or to the property of another entity under §523(a)(6)

Another exception to the discharge of a debt is for the "willful and malicious injury by the debtor to another entity or to the property of another entity." The Tenth Circuit stated:

> "Willful and malicious injury occurs when the debtor, without justification or excuse, and with full knowledge of the specific consequences of his conduct, acts notwithstanding, knowing full well that his conduct will cause particularized injury. This standard requires not only intentional conduct on the part of the debtor, but also intentional or deliberate injury. Secured creditors are not restricted to direct evidence of specific intent to injure in satisfying the requirements of this section; rather, the requisite malicious intent may be demonstrated by evidence that the debtor had knowledge of creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights. Thus, the debtor's

---

[16] *Sawaged* at 9.

actual knowledge or reasonable foreseeability that his conduct will result in injury to the creditor, are highly relevant.  Proof of actual knowledge or reasonable foreseeability of injury do not automatically require the trier of fact to find willful and malicious injury.  The 'willful' element is straight forward.  The malicious element is more complex.  One without the other will not suffice to bar a discharge under § 523(a)(6).[17]

The United States Supreme Court held,

> "The word 'willful' modifies the work 'injury' indicating that non-dischargeability takes a deliberate or intentional injury not merely a deliberate or intentional act that leads to injury.  Negligent or reckless acts do not suffice to establish that a resulting injury is "willful and malicious." Intentional torts generally require that the actor intends 'the consequence of an act' not simply the act itself."[18]

The term "malicious" requires proof that the debtor either intended the resulting injury or intentionally takes action that is substantially certain to cause injury.  Unless a debt is the result of a willful and malicious act intended to injure a person, the debt is discharged.[19]

The court has found that the Debtor deliberately and intentionally retained the amount of $2,900.00 from the sale proceeds, intending that the Credit Union would not receive that amount.  Debtor had full knowledge that the Credit Union would not receive this portion of the proceeds.  The Debtor willfully and maliciously injured the Credit Union in the amount of $2,900.00.

In conclusion, the court finds that the Credit Union's claim is exempted from

---

[17] *In re Pasek*, 983 F.2d 1524 (10th Cir. 1993).

[18] *Kawahau v. Geiger*, 523 U.S. 57 (1998).

[19] *Panalis v Moore*, 357 F.3d 1125 (10th Cir. 2004).

discharge in part, in the amount of $2,900.00, pursuant to § 523(a)(2) and (a)(6).

Request for attorney's fees

The Credit Union asserts that its should be awarded the amount of $12,032.50 in
attorney's fees and recovery of $308.00 in costs for a total award of $12,340.50. The
Credit Union bases its argument on the loan agreement executed between the Sayers and
the Credit Union. The loan agreement provides that the Sayers, as borrowers "promise to
pay all costs, including but not limited to any attorney fees, we [the Credit Union] incur in
protecting our security interest and rights in the property[.]"[20] However, the court finds
that the Debtor is not a party to this loan agreement. The consignment agreement
executed between the Debtor and the Credit does not provide for attorney fees.
Therefore, the court denies the Credit Union's request for attorney fees.

This opinion constitutes the Court's findings of fact and conclusions of law. A
separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this __3__ day of October, 2013.

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
    Paul Hunter
    Thomas M. Hogan

---

[20] Plaintiff's Exhibit 1, page 5/9, ¶4.